[No. B150613. Second Dist., Div. Five. Apr. 5, 2002.]

THE PEOPLE, Plaintiff and Respondent, v.
CHARLES STERLING MEARNS, Defendant and Appellant.

**COUNSEL**

Jeffrey A. Schafer, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Robert F. Katz and Michael R. Johnsen, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**TURNER, P. J.—**

### I. Introduction

Defendant, Charles Sterling Mearns, appeals from his conviction, based upon guilty pleas, for rape by force (Pen. Code,[1] § 261, subd. (a)(2)) and first degree burglary. (§ 459.) Defendant also admitted he was personally armed with a knife in the commission of the rape. (§ 12022.3, subd. (a).) Defendant's sole contention on appeal is the trial court improperly ordered direct restitution to the victim for the difference between the cost of purchasing a new trailer and the sale price of her former mobilehome. Based on the provisions of section 1202.4, subdivision (f) and (f)(3)(I), we conclude the trial court did not abuse its discretion in awarding restitution to Susan F. for the costs of relocating to another residence after she was violently sexually assaulted in her mobilehome.

### II. Factual Background Relevant to the Attack on Susan F.

We view the evidence in a light most favorable to the judgment. (*Jackson v. Virginia* (1979) 443 U.S. 307, 319 [99 S.Ct. 2781, 2789, 61 L.Ed.2d 560]; *People v. Osband* (1996) 13 Cal.4th 622, 690 [55 Cal.Rptr.2d 26, 919 P.2d 640]; *Taylor v. Stainer* (9th Cir. 1994) 31 F.3d 907, 908-909.) According the probation report, on May 24, 2000, defendant entered the mobilehome of Susan F. in her absence. When Susan F. returned home, she noticed the drapes to her bedroom had been closed. Susan F. entered her bedroom. As Susan F. bent to pick up a bra on the floor that had not been there earlier, defendant shut the bedroom door. Defendant had been waiting for her in the corner of the bedroom. Defendant threw Susan F. onto the bed. Defendant was holding a three-inch serrated knife. Defendant bound and gagged Susan F. After licking her breasts, defendant placed his fingers in her vagina moving them in and out for three or four minutes. Defendant then forcefully raped Susan F. with the knife held close to her face. As he was raping her, defendant said, "I am going to fuck you so hard, harder than you have ever been in your life." Before leaving her residence, according to the probation report, "[T]he defendant told the victim, that if she did not be quiet, he knows w[h]ere her son goes to school and he would hurt her son." Defendant pushed Susan F. back onto the bed. Defendant then once again threatened to hurt the son of Susan F. Defendant took several items of Susan F.'s jewelry from her home.

Defendant was arrested on July 17, 2000, in Martin County, Florida. Defendant was apprehended by Martin County sheriff's deputies while

---

[1]All further statutory references are to the Penal Code unless otherwise indicated.

attempting to flee by bus to Buffalo, New York. When deputies approached the trailer where defendant was hiding, he fled. He was arrested after he "fled out the back door." A bag defendant had packed for the trip to Buffalo, New York contained a "12 gauge shotgun."

## III. DISCUSSION

Defendant argues the trial court improperly imposed a restitution fine that included reimbursement to Susan F. for the relocation costs she incurred in purchasing a new mobilehome.

### A. *Procedural Background*

At the time defendant entered his guilty pleas on January 29, 2001, the trial court, continued sentencing and ordered the probation department to prepare a report, including the amount of restitution due Susan F. On March 9, 2001, the trial court requested documentation detailing the economic damages suffered by Susan F. and continued the sentencing hearing. At the April 19, 2001, sentencing hearing, counsel stipulated to the fact that Susan F. sold her mobilehome for $13,000 and purchased a new mobilehome for $26,575. However, defense counsel objected to an award to Susan F. of the difference between the sale and purchase prices of the two residences as part of the restitution order. Susan F. testified she sold her mobilehome to the first available buyer because she wanted to leave the residence where she had been raped and her son threatened. Susan F. stated: "There's a ton of bad memories. I mean, I just can't live like that." Susan F. acknowledged that she might have been able to sell her mobilehome for more money if she had waited and utilized the services of an agent. She further stated she bought a mobilehome of the same size in a gated community because that was all she could afford. A letter prepared by a Los Angeles County Sheriff's detective identified only as L. Valentine revealed Susan F.'s original mobilehome was incapable of being secured from intruders because of its shoddy construction. Detective Valentine described the flimsy construction of the trailer where Susan F. was sexually assailed as follows, "[E]ven if you secured the doors and windows, it would not take much effort to punch your way through the walls or shimmy the louver windows and gain access to the home." Detective Valentine further reported: "The victim is suffering emotional stress as a result of the assault. She is in constant fear of being assaulted again. She has made statements to the effect that she is unable to live a normal life and that she is in fear of her son's safety. It is my opinion that the victim and her son would benefit from long term psychological therapy." The sexual assault occurred on May 24, 2000. Defendant was not arrested until July 17, 2000. Susan F. completed the purchase of her residence after defendant's arrest.

B. *Restitution*

In 1982, California voters amended the state Constitution by way of initiative which established a new constitutional right for crime victims to obtain restitution for losses suffered as a result of a criminal act and directed the Legislature to enact laws empowering the trial courts to issue such orders. Article I, section 28, of the California Constitution provides, "(b) Restitution. It is the unequivocal intention of the People of the State of California that all persons who suffer losses as a result of criminal activity shall have the right to restitution from the persons convicted of the crimes for losses they suffer." (See also *People v. Broussard* (1993) 5 Cal.4th 1067, 1070-1074 [22 Cal.Rptr.2d 278, 856 P.2d 1134] [victim restitution is mandated by the California Constitution]; *People v. Young* (1995) 38 Cal.App.4th 560, 564-567 [45 Cal.Rptr.2d 177] [same].) Section 1202.4, which implements the constitutional mandate, provides in pertinent part: "(a)(1) It is the intent of the Legislature that a victim of crime who incurs any economic loss as a result of the commission of a crime shall receive restitution directly from any defendant convicted of that crime. [¶] . . . [¶] (f) In every case in which a victim has suffered economic loss as a result of the defendant's conduct, the court shall require that the defendant make restitution to the victim or victims in an amount established by court order, based on the amount of loss claimed by the victim . . . . [¶] . . . [¶] (3) . . . [¶] (I) Expenses incurred by an adult victim in relocating away from the defendant, including, but not limited to, deposits for utilities and telephone service, deposits for rental housing, temporary lodging and food expenses, clothing, and personal items. Expenses incurred pursuant to this section shall be verified by law enforcement to be necessary for the personal safety of the victim or by a mental health treatment provider to be necessary for the emotional well-being of the victim." This language controls the outcome of the present appeal.

1. *Standard of review*

■ We review a restitution order for abuse of discretion. (*People v. Thygesen* (1999) 69 Cal.App.4th 988, 992 [81 Cal.Rptr.2d 886]; *People v. Ortiz* (1997) 53 Cal.App.4th 791, 800 [62 Cal.Rptr.2d 66].) Our colleagues in Division Two of this appellate district noted, "Under that standard, we are required to keep in mind that even though the trial court has broad discretion in making a restitution award, that discretion is not unlimited. While it is not required to make an order in keeping with the exact amount of loss, the trial court must use a rational method that could reasonably be said to make the victim whole, and may not make an order which is arbitrary or capricious." (*People v. Thygesen, supra,* 69 Cal.App.4th at p. 992; see also *People v.*

*Carbajal* (1995) 10 Cal.4th 1114, 1121 [43 Cal.Rptr.2d 681, 899 P.2d 67]; *People v. Draut* (1999) 73 Cal.App.4th 577, 581-582 [86 Cal.Rptr.2d 469]; *People v. Tucker* (1995) 37 Cal.App.4th 1, 6 [44 Cal.Rptr.2d 1].) As our colleagues in the Court of Appeal for the Fourth Appellate District, Division Two, recently held, "When there is a factual and rational basis for the amount of restitution ordered by the trial court, no abuse of discretion will be found by the reviewing court." (*People v. Dalvito* (1997) 56 Cal.App.4th 557, 562 [65 Cal.Rptr.2d 679]; *People v. Whisenand* (1995) 37 Cal.App.4th 1383, 1390 [44 Cal.Rptr.2d 501].) Moreover, in *People v. Rowland* (1997) 51 Cal.App.4th 1745, 1754 [60 Cal.Rptr.2d 351], our colleague, Presiding Justice J. Anthony Kline, noted, "The statute [(§ 1202.4)] requires the award be set in an amount which will fully reimburse the victim for his or her losses unless there are clear and compelling reasons not to do so. . . ."

### 2. *Legislative intent*

While recognizing the mandate of the constitution and section 1202.4 to provide such restitution, we have found no authority discussing a restitution award similar to that made in this case. We must, therefore, interpret the statute to determine if the relocation losses are permitted. ▪ We apply the following standard of statutory review described by the California Supreme Court: "When interpreting a statute our primary task is to determine the Legislature's intent. [Citation.] In doing so we turn first to the statutory language, since the words the Legislature chose are the best indicators of its intent. [Citation.]" (*Freedom Newspapers, Inc. v. Orange County Employees Retirement System* (1993) 6 Cal.4th 821, 826 [25 Cal.Rptr.2d 148, 863 P.2d 218]; see also *People v. Rubalcava* (2000) 23 Cal.4th 322, 328 [96 Cal.Rptr.2d 735, 1 P.3d 52]; *People v. Birkett* (1999) 21 Cal.4th 226, 231 [87 Cal.Rptr.2d 205, 980 P.2d 912]; *People v. Jones* (1993) 5 Cal.4th 1142, 1146 [22 Cal.Rptr.2d 753, 857 P.2d 1163].) The Supreme Court has emphasized that the words in a statute selected by the Legislature must be given a "commonsense" meaning when it noted: " 'Our first step [in determining the Legislature's intent] is to scrutinize the actual words of the statute, giving them a plain and commonsense meaning. (*Mercer* v. *Department of Motor Vehicles* (1991) 53 Cal.3d 753, 763 [280 Cal.Rptr. 745, 809 P.2d 404]; *Lungren* v. *Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299].)' (*People* v. *Valladoli* (1996) 13 Cal.4th 590, 597 [54 Cal.Rptr.2d 695, 918 P.2d 999].)" (*California Teachers Assn. v. Governing Bd. of Rialto Unified School Dist.* (1997) 14 Cal.4th 627, 633 [59 Cal.Rptr.2d 671, 927 P.2d 1175].) Further, our Supreme Court has noted: " 'If the language is clear and unambiguous there is no need for construction, nor is it necessary to resort to indicia of the intent of the Legislature (in the case of a statute) . . . .' " (*Delaney v. Superior Court* (1990) 50 Cal.3d 785, 798

[268 Cal.Rptr. 753, 789 P.2d 934].) However, the literal meaning of a statute must be in accord with its purpose as the Supreme Court noted in *Lakin v. Watkins Associated Industries* (1993) 6 Cal.4th 644, 658-659 [25 Cal.Rptr.2d 109, 863 P.2d 179] as follows: "We are not prohibited 'from determining whether the literal meaning of a statute comports with its purpose or whether such a construction of one provision is consistent with other provisions of the statute. The meaning of a statute may not be determined from a single word or sentence; the words must be construed in context, and provisions relating to the same subject matter must be harmonized to the extent possible. [Citation.] Literal construction should not prevail if it is contrary to the legislative intent apparent in the [statute]. . . .' " In *Lungren v. Deukmejian, supra,* 45 Cal.3d at p. 735, our Supreme Court added: "The intent prevails over the letter, and the letter will, if possible, be so read as to conform to the spirit of the act. [Citations.] An interpretation that renders related provisions nugatory must be avoided [citation]; each sentence must be read not in isolation but in light of the statutory scheme [citation] . . . ."

■ The Supreme Court has held: " 'The courts must give statutes a reasonable construction which conforms to the apparent purpose and intention of the lawmakers.' (*Clean Air Constituency* v. *California State Air Resources Bd.* (1974) 11 Cal.3d 801, 813 [114 Cal.Rptr. 577, 523 P.2d 617].)" (*Webster v. Superior Court* (1988) 46 Cal.3d 338, 344 [250 Cal.Rptr. 268, 758 P.2d 596].) Further, the Supreme Court has held: "We have recognized that a wide variety of factors may illuminate the legislative design, ' "such as context, the object in view, the evils to be remedied, the history of the time and of legislation upon the same subject, public policy, and contemporaneous construction." ' (*In re Marriage of Bouquet* [(1976)] 16 Cal.3d 583, 587 [128 Cal.Rptr. 427, 546 P.2d 1371], quoting *Alford* v. *Pierno* (1972) 27 Cal.App.3d 682, 688 [104 Cal.Rptr. 110].)" (*Walters v. Weed* (1988) 45 Cal.3d 1, 10 [246 Cal.Rptr. 5, 752 P.2d 443].) Ultimately, "[w]e must select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences. [Citation.]" (*People v. Jenkins* (1995) 10 Cal.4th 234, 246 [40 Cal.Rptr.2d 903, 893 P.2d 1224].)

   3. *Application of statutory interpretation principles to the economic loss sustained by Susan F.*

■ To begin with, section 1202.4, subdivision (f) unequivocally requires restitution of a victim for "economic loss as a result of the defendant's conduct." A victim's restitution right is to be broadly and liberally construed. (*People v. Lyon* (1996) 49 Cal.App.4th 1521, 1525 [57 Cal.Rptr.2d

415]; *People v. Phelps* (1996) 41 Cal.App.4th 946, 950 [48 Cal.Rptr.2d 855].) Our colleague, retired Associate Justice Edward J. Wallin, synthesized the voters' intent as follows, "The intent of the voters is plain: every victim who suffers a loss shall have the right to restitution from those convicted of the crime giving rise to that loss." (*People v. Phelps, supra,* 41 Cal.App.4th at p. 950.) The language of the first sentence in section 1202.4, subdivision (f) expressly indicates the victim's restitution right extends to "economic loss" resulting from the defendant's conduct.

Likewise, the language of section 1202.4, subdivision (f)(3)(I) is clear. It provides for the reimbursement of the victim's relocation expenses "including, but not limited to" such items as deposits for utilities and rental housing, temporary lodging, and the like if determined by law enforcement to be necessary for the personal safety of the victim. Section 1202.4, subdivision (f)(3)(I) resulted from the adoption of Assembly Bill No. 606 in 1999. (Stats. 1999, ch. 584, § 4.) Assembly Bill No. 606 was designed to permit reimbursement of crime victims for offenses occurring in their homes. (Legis. Counsel's Dig., Assem. Bill No. 606 (1999-2000 Reg. Sess.) ch. 584, p. 91.) Given the statutory language and legislative intent expressed in the Legislative Counsel's Digest, relocation expenses such as those awarded here can come within the broad parameters of the restitution statutes and the constitutional intent to make the victim whole. (See *People v. Tucker, supra,* 37 Cal.App.4th at p. 6 [the award of restitution in an amount higher than the amount actually embezzled based on the projected appreciation of funds held to be within the trial court's discretion].)

### 4. *Propriety of trial court's exercise of discretion*

■ We look now to the trial court's exercise of discretion in this case. In awarding $13,575, the difference between the sale of Susan F.'s original mobilehome and the purchase price of the new mobilehome, the trial court reasoned, "The intent of the Legislature is to really make a victim as whole as one can do so in a monetary way without waiving any due process rights that the defendant might have or the victim might have to compensation in a civil court." The trial court continued: "I think the reasonable concept transcends all of these various provisions; for example, on the purchase of a new home. The victim in this particular case went through one of the most traumatic events one unfortunately would suffer in a lifetime. It happened at home. . . . [¶] . . . [¶] One—especially a woman by herself with an 8-year-old—has to make certain decisions, and all we can do with those decisions is maybe not agree that you would do the same thing or I would, but would a reasonable person in those circumstances? [¶] The mobile home itself is a fairly open environment, it seems to me. It doesn't have the

traditional protections of a more permanent home. That's reflected in Detective Valentine's report. So I don't think it unreasonable for one to decide they're going to relocate, in part because it's therapeutic—[¶] As you suggest, bad memories. [¶]—And in part because one does not want their whereabouts known for whatever reason. [¶] And so I think relocation is a principle that the courts would accept as realistic under the facts and circumstances of an individual case. It occurred in the mobile home. It occurred at that location. I think the victim is entitled to relocate."

The trial court noted that the law did not allow a victim to be opportunistic. The court stated: "On the other hand, one has to take into account that one is not deciding to relocate because one desires that. They're doing it out of a reaction to a criminal act. And you then, therefore, have to take concepts like immediacy and emergency, as in this case, for example, in which this unit was sold well under market apparently. One has to go out and find another location that gives security, like a gated community, and which also provides the same basic living environment. We understand that whatever we do, it's probably going to cost more the longer we wait to do it."

The trial court could properly award $13,575 for the relocation costs to the new mobilehome. The trial court's finding was rational, well reasoned, based on factual evidence presented at the hearing, and within its broad discretion. (*People v. Ortiz, supra,* 53 Cal.App.4th at pp. 799-800; *People v. Rowland, supra,* 51 Cal.App.4th at p. 1754; *In re S. S.* (1995) 37 Cal.App.4th 543, 548 [43 Cal.Rptr.2d 768].) The trial court allowed only those expenses directly related to the difference in price between the two mobilehomes, excluding such expenses as monthly private security guard response fees, space rental, and finance charges.

Two separate comments are in order concerning defendant's contention that Susan F. did not move to the new mobilehome in order to avoid further contact with defendant. Defendant relies on the language in section 1202.4, subdivision (f)(3)(I), which indicates a victim is entitled to relocation expenses "incurred by an adult victim in relocating away from the defendant." Defendant argues that Susan F. moved sometime in 2001 and he was arrested on July 17, 2000; hence, he reasons she did not move in order to relocate away from him. First, defendant knew where Susan F. lived and where her son attended school. Because defendant was in custody does not mean the trial court was required to conclude Susan F. moved for some other reason. When she moved, defendant had not been convicted of anything. Defendant could have been acquitted or released from custody for some other reason. According to Deputy Valentine: "[Susan F.] is in constant fear of being assaulted again. She has made statements to the effect that she is

unable to live a normal life and she is in fear of her son's safety." This provides a rational basis for concluding that in moving to another mobilehome, Susan F. did so in material part because she was "relocating away from . . . defendant" within the meaning of 1202.4, subdivision (f)(3)(I). Once she moved, defendant had no knowledge of her whereabouts. Defendant could no longer find her nor carry out his threats if he was released. Second, putting aside the specific wording in section 1202.4, subdivision (f)(3)(I), the trial court reasonably could have concluded that the increased costs incurred in the move was an "economic loss" within the general language of the first sentence of section 1202.4, subdivision (f). She moved in order to prevent defendant from finding her again and reduce the fears engendered by the very mobilehome where she was sexually assaulted at knife point. The trial court could reasonably conclude that the enormous emotional trauma resulting from the attack was such that Susan F. virtually had to move and this was an "economic loss" resulting from defendant's conduct without relying on the more specific language in section 1202.4, subdivision (f)(3)(I). No abuse of discretion occurred.

## IV. DISPOSITION

The judgment is affirmed.

Armstrong, J., and Mosk, J., concurred.

Appellant's petition for review by the Supreme Court was denied June 19, 2002. Kennard, J., did not participate therein. Brown, J., was of the opinion that the petition should be granted.