Filed 12/7/20  P. v. Oliphant CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SECOND APPELLATE DISTRICT

### DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B294384 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. LA074495) |
| v. | |
| JACQUE OLIPHANT, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Michael K. Kellogg, Judge.  Affirmed.

William L. Heyman, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Senior Assistant Attorney General, Susan S. Pithey and Thomas C. Hsieh, Deputy Attorneys General, for Plaintiff and Respondent.

————————————

# INTRODUCTION

Jacque Oliphant appeals from the trial court's order revoking and then reinstating his probation and increasing the amount of his monthly victim restitution payment from $150 to $1,000. Oliphant argues the trial court abused its discretion in determining that he had the ability to pay the increased amount in monthly restitution. We affirm.

# FACTUAL BACKGROUND AND PROCEDURAL HISTORY

A. *Oliphant Is Ordered to Pay $50,000 in Victim Restitution as a Condition of His Probation*

In a felony complaint, the Los Angeles County District Attorney charged Oliphant with 12 counts of theft-related offenses. The charges arose out of an alleged conspiracy between Oliphant and his codefendant, Michael Spinale, to steal a number of items from the home of Maria Welsh while she was out of town for several months due to a family illness. On August 20, 2014, Oliphant pleaded no contest to one count of receiving stolen property.

On May 20, 2015, the trial court placed Oliphant on formal probation for three years subject to certain terms and conditions. One condition of probation was that Oliphant and Spinale pay restitution to the victim, Welsh, in the stipulated amount of $50,000 pursuant to Penal Code section 1202.4, subdivision (f).[1] The court dismissed the remaining counts against Oliphant pursuant to a negotiated plea.

---

[1] All further statutory references are to the Penal Code.

On September 13, 2017, the trial court issued an order stating Oliphant and Spinale were joint and severally liable for $50,000 in victim restitution, and directing them to pay that amount to Welsh for the value of her stolen or damaged property.

B. *The Trial Court Holds an Ability-to-pay Hearing on Oliphant's Monthly Restitution Payment*

Starting on October 10, 2017 and concluding on August 31, 2018, the trial court held a multi-day hearing on Oliphant's ability to pay the monthly restitution owed. Two financial evaluators, Oliphant's probation officer, and Kimberly Henderson, Oliphant's girlfriend, were called to testify. At the conclusion of the first day of testimony, the court extended Oliphant's probation to May 20, 2019 pending completion of the hearing.

The probation department initially required Oliphant to pay $25 per month in restitution. After Welsh complained the monthly payment was too low, the department conducted an updated financial evaluation of Oliphant in June 2017, and then increased the restitution payment to $150 per month. Luisa Lazo, a financial evaluator with the department, conducted the June 2017 evaluation. Oliphant was uncooperative with Lazo during the evaluation, and he provided only a limited number of the documents Lazo had requested. Margaret Chavez, a senior financial evaluator with the department, took over the case following Lazo's death. Chavez conducted a second evaluation of Oliphant in February 2018, and a third evaluation in August 2018.

At the hearing, Chavez testified about the contents of Lazo's case file and Chavez's own evaluations of Oliphant.

According to Lazo's file, when Oliphant met with her for the June 2017 evaluation, he was evasive and irate. He told Lazo he owned two entertainment-related businesses and had bank accounts and filed income taxes for those entities. Oliphant refused, however, to provide any financial records related to his businesses because he claimed such information was confidential. Oliphant also told Lazo he paid over $2,000 per month in rent and leased an automobile, but refused to provide proof of either expense. Because Oliphant was being uncooperative, Lazo requested that the supervising deputy of probation and Oliphant's probation officer assist with the evaluation. Oliphant thereafter changed his story, telling Lazo his female friend financially supported him. Oliphant gave Lazo a letter from his friend confirming her financial support. He also provided copies of his social security and identification cards and a credit report. Lazo learned at that time that Oliphant had a second social security number. Lazo later generated a "Lexis Nexis report" for Oliphant, which showed he owned eight properties and two businesses.

When Chavez met with Oliphant in February 2018, Oliphant reported he was not currently employed and was financially supported by Henderson. Oliphant claimed his only expense was a lease on a 2017 Jaguar. The monthly payment for the lease was $754.27, and the monthly payment for automobile insurance was $291.65. Oliphant provided Chavez with an updated letter of financial support from Henderson and billing statements for the automobile lease and insurance. Although both the lease agreement and insurance policy were in his name, Oliphant claimed Henderson was covering those expenses. Oliphant also provided Chavez with tax records, which reflected

4

he did not file personal income tax returns in 2014, 2015, and 2016. Oliphant did not provide any documents related to any businesses he owned and, despite his prior representation to Lazo, he denied he had filed income tax returns for any business. A report generated by Chavez indicated Oliphant owned a number of different properties, including a residence in Philadelphia, Pennsylvania he had purchased in May 2017 for $245,000. Oliphant told Chavez, however, he no longer owned those properties due to a divorce. Despite Chavez's request, Oliphant did not provide any documents showing any assets or income.

When Chavez met with Oliphant again in August 2018, Oliphant reported he was still being fully supported by Henderson. As part of her evaluation, Chavez had obtained a copy of Oliphant's lease agreement for the Jaguar, which showed Oliphant made a $3,000 cash down payment on the lease in December 2016. A copy of a 2016 pay stub was also attached to the lease agreement, and reflected Oliphant was paid $9,000 from a company for a two-week period in November 2016. When Chavez showed the pay stub to Oliphant, Oliphant admitted he had worked for the company, but claimed the earnings shown on the document were merely a projection of his income. Chavez also inquired about the Philadelphia property Oliphant had purchased in May 2017. Oliphant indicated the property was the result of a gift from a family member, and his son and his son's mother were residing there. Although Oliphant claimed the mother was paying the mortgage on the property, he did not provide any supporting documentation. In response to Chavez's inquiry about his efforts to obtain employment, Oliphant indicated he was not working because he had a felony conviction.

5

He then stated he was trying to start a private business with a partner, but could not do so because of the restrictions on his ability to travel. At the end of the evaluation, Chavez did not further increase the monthly restitution, but she encouraged Oliphant to pay more than the minimum amount due. Oliphant agreed he would try to pay at least $300 per month.

Herman Sweet was Oliphant's probation officer. During the June 2017 financial evaluation, Sweet was asked to join the meeting with Lazo because Oliphant had become agitated. When Sweet arrived, Oliphant was objecting to Lazo's requests for certain financial information and documents. Sweet warned Oliphant he needed to cooperate with the evaluator. In August 2017, Oliphant asked Sweet for permission to travel to New Jersey because he was attempting to sell a piece of property he owned so he could pay off the restitution. When Oliphant returned from the trip, he did not indicate whether he had sold the property. However, Oliphant did not pay the balance of the restitution owed to Welsh and instead continued to make the minimum monthly payment.

According to Sweet, whenever the restitution order failed to specify a monthly amount, the probation department's policy was to set the minimum restitution payment at $25 per month regardless of the defendant's ability to pay. If the victim later complained the monthly payment was too low, the department typically would conduct an updated financial evaluation of the defendant. Following the June 2017 evaluation conducted by Lazo, Oliphant's minimum monthly restitution payment was increased to $150. Oliphant began paying this amount in July 2017 and did not miss any payments. Welsh, however, was still not satisfied with the increased amount and complained to

Sweet's supervisor and the prosecutor assigned to the case. Welsh then requested an ability-to-pay hearing.

At the hearing, Henderson testified as follows: She had lived with Oliphant for the past eight years; they rented a townhome together for $1,890 per month; and she and Oliphant previously had split the rent and other living expenses evenly between them. However, for the past year, Henderson had been covering 90 percent of the couple's expenses, including rent, utilities, food, and clothing, because Oliphant had been unable to work. According to Henderson, she was the primary driver of the Jaguar and paid for the lease and insurance on the vehicle. The lease was in Oliphant's name because Henderson's credit had been tarnished in a contentious divorce. Henderson was self-employed and worked as a fitness trainer, a group fitness instructor, a loan consultant, and a loan signing agent. Her gross income averaged between $5,000 and $6,000 per month. She earned approximately $35,000 in 2016 and $40,000 in 2017. She had no significant assets and was not involved in Oliphant's businesses.

C. *The Trial Court Finds Oliphant Violated His Probation and Increases His Monthly Restitution Payment*

On August 31, 2018, at the conclusion of the ability-to-pay hearing, the trial court found Oliphant had complied with his obligation to pay victim restitution to Welsh because he had paid the minimum monthly amount set by the probation department. The court found, however, that Oliphant had violated the conditions of his probation by failing to cooperate with the department and to provide complete information during the financial evaluation process. The court revoked and then

reinstated Oliphant's probation for an additional two-year period to August 20, 2020. The court also increased Oliphant's minimum monthly restitution payment from $150 to $1,000. In setting that amount, the court advised Oliphant: "I'm going to find that you have the ability to be gainfully employed and you have ability to cut back on the expenses while you're on probation. Probation will terminate upon completion of the payment of restitution in full. Cost of probation will be stayed while you are paying restitution. The court is going to set that amount starting on November the 1st. That will be $1000 a month, which will give you plenty of time, either to collect assets or to get yourself a real job, one in which there are plenty of employment opportunities." Following the hearing, Oliphant timely appealed the court's order.

## DISCUSSION

On appeal, Oliphant challenges the portion of the trial court's August 31, 2018 order directing him to pay restitution at an increased rate of $1,000 per month. Oliphant contends the trial court abused its discretion in setting the amount of the minimum monthly restitution payment because the evidence was insufficient to support a finding he had the ability to pay the increased amount.

A. *Governing Law*

Section 1202.4 provides, in relevant part, that "[i]t is the intent of the Legislature that a victim of crime who incurs an economic loss as a result of the commission of a crime shall receive restitution directly from a defendant convicted of that crime." (§ 1202.4, subd. (a)(1).) Subject to certain exceptions not

8

applicable here, "in every case in which a victim has suffered economic loss as a result of the defendant's conduct, the court shall require that the defendant make restitution to the victim or victims in an amount established by court order, based on the amount of loss claimed by the victim or victims or any other showing to the court." (*Id*., subd. (f).)  Restitution "shall be of a dollar amount that is sufficient to fully reimburse the victim or victims for every determined economic loss incurred as the result of the defendant's criminal conduct," including "payment for the value of stolen or damaged property." (*Id*., subd. (f)(3)(A).)  "The court may modify the amount [of restitution], on its own motion or on the motion of the district attorney, the victim or victims, or the defendant." (*Id*., subd. (f)(1).)

Section 1202.4 further provides that "[i]n every case in which the defendant is granted probation, the court shall make the payment of restitution fines and orders imposed pursuant to this section a condition of probation." (§ 1202.4, subd. (m).)  Under section 1203.3, "[t]he court has the authority at any time during the term of probation to revoke, modify, or change its order of suspension of imposition or execution of sentence." (§ 1203.3, subd. (a).)  This includes the power to modify or extend the term of probation based on the defendant's failure to pay the amount of restitution ordered within the original probationary period.  (*People v. Cookson* (1991) 54 Cal.3d 1091, 1095-1096 [where monthly payment set by the probation department "had resulted in defendant's inability to pay full restitution as contemplated within the original period of probation," the trial court did not err in extending defendant's probationary term to ensure the full amount was paid].)  As the Supreme Court has explained, "[a]llowing modification of probation to facilitate the

9

recovery of restitution as originally contemplated by the court enables the court to fashion a remedy that best serves the goals of probation." (*Id.* at p. 1097.)

We review a trial court's restitution order for abuse of discretion. (*Luis M. v. Superior Court* (2014) 59 Cal.4th 300, 305; *People v. Giordano* (2007) 42 Cal.4th 644, 663.) Under the abuse of discretion standard, the defendant must establish "the trial court's decision was so erroneous that it "'falls outside the bounds of reason.""" (*People v. Miracle* (2018) 6 Cal.5th 318, 346.) "We broadly and liberally construe a victim's right to restitution, and will find no abuse of discretion so long as ""'there is a factual and rational basis for the amount of restitution ordered.""" [Citation.] When determining whether such a basis exists, our ""'power . . . begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted," to support the . . . court's findings."" [Citation.]" (*People v. Grundfor* (2019) 39 Cal.App.5th 22, 27; see *People v. Riddles* (2017) 9 Cal.App.5th 1248, 1252 ["""'When there is a factual and rational basis for the amount of restitution ordered by the trial court, no abuse of discretion will be found by the reviewing court."""""].)

### B. *The Trial Court Did Not Abuse Its Discretion in Increasing Oliphant's Monthly Restitution Payment*

In this case, the trial court had a factual and rational basis for increasing Oliphant's minimum restitution payment to $1,000 per month. While Oliphant claims he lacked the ability to pay the increased amount, the evidence demonstrated that, during the original probationary period, Oliphant had sufficient funds to make significant expenditures. For example, in December 2016, Oliphant entered into a three-year lease for a 2017 Jaguar. At

that time, he made a $3,000 cash down payment on the lease. As the leaseholder, Oliphant was thereafter responsible for paying approximately $700 per month for the lease and $300 per month for automobile insurance. The monthly expenditures on the Jaguar alone were thus sufficient to cover the $1,000 restitution payment.

Additionally, the evidence showed that, in May 2017, Oliphant purchased a residence in Philadelphia. Although Oliphant claimed the property was a gift from an unidentified family member, the information Chavez obtained indicated the property was purchased for $245,000, and Oliphant's name was on the deed. There was also evidence Oliphant owned other real estate during the probationary period. Oliphant's probation officer recounted that, in August 2017, Oliphant requested permission to travel to New Jersey because he was attempting to sell a piece of property to pay off the balance of the restitution.

On appeal, Oliphant asserts that none of the evidence affirmatively showed he had sufficient equity in any property to encumber it. Oliphant, however, uniquely possessed such information, and he was not forthcoming about it during the financial evaluation process. Indeed, despite the evaluators' requests, Oliphant failed to provide them with any documents showing any assets or income. Based on the evidence that was presented, the trial court reasonably could have inferred Oliphant had access to financial resources he had not fully disclosed.

The trial court also reasonably concluded Oliphant was capable of finding employment to enable him to pay an increased monthly amount in restitution. In his August 2018 interview with Chavez, Oliphant claimed he was not working because he

11

had a felony conviction.  As Chavez explained to him, however, there were many individuals "who also have felonies but have found jobs."  In his appellate brief, Oliphant asserts Chavez may have been referring to "jobs as day laborers," whereas he "is an entrepreneur."  Oliphant's desired profession, however, is irrelevant to whether he has the ability to pay the monthly restitution ordered by the court.  There is nothing in the record to suggest Oliphant was incapable of performing work, whether as a manual laborer or other gainfully employed individual.  (See *People v. Hennessey* (1995) 37 Cal.App.4th 1830, 1837 [trial court properly found defendant had ability to pay restitution fine despite lack of current employment because the "court was entitled to infer defendant's unemployment . . . arose from a lifestyle choice"]; *People v. Frye* (1994) 21 Cal.App.4th 1483, 1487 ["in determining whether a defendant has the ability to pay a restitution fine, the court is not limited to considering a defendant's *present* ability but may consider a defendant's ability to pay in the future"].)

In arguing the trial court abused its discretion in setting the minimum monthly restitution payment, Oliphant primarily relies on Henderson's testimony that she was paying 90 percent of the couple's living expenses, including the lease payment on the Jaguar and the insurance for it.  However, it was the exclusive province of the trial court to evaluate the credibility of the witnesses and the weight to be accorded their testimony. (*People v. Beck and Cruz* (2019) 8 Cal.5th 548, 627 [""it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends"""].)  The trial court, accordingly, was entitled to discredit Henderson's testimony about the

12

couple's allocation of expenses, and to infer Oliphant, rather than Henderson, was paying for and driving the Jaguar. The court also reasonably could have inferred from the totality of evidence presented Oliphant had not been forthcoming about the financial resources available to him, and he had access to sufficient funds or employment opportunities to pay considerably more in restitution each month.

Where, as here, "'the circumstances reasonably justify the trier of fact's findings, reversal . . . is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.'" (*People v. Covarrubias* (2016) 1 Cal.5th 838, 890.) Because there was sufficient evidence to support the finding Oliphant had the ability to pay $1,000 per month in victim restitution, the trial court did not abuse its discretion in ordering Oliphant to pay the increased amount.

## DISPOSITION

The trial court's August 31, 2018 restitution order is affirmed.

RICHARDSON, J.*

We concur:

SEGAL, Acting P. J.

FEUER, J.

---

\* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.